**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

JOHN RODGERS BURNLEY,
     Plaintiff,

       v.                                 Civil Action No.  3:23-cv-00160 (RCY)

ALEXANDRA M. VALENTIN, *et al.*,
     Defendants.

**MEMORANDUM OPINION**

This matter was referred to the undersigned to resolve Defendants Jeffrey W. Walburn ("Walburn")[1] and Margaret Cunningham's ("Cunningham") Motions to Enforce the Settlement and Mutual Release Agreement, entered into by the parties on November 17, 2023 (ECF No. 169). (ECF No. 167) (the "Walburn Motion to Enforce"); (ECF No. 170) (the "Cunningham Motion to Enforce"). For the reasons set forth below, the Court GRANTS the Walburn Motion to Enforce (ECF No. 167) and DENIES, in part as moot, and DENIES, in part, without prejudice Cunningham's Motion to Enforce (ECF No. 170). Additionally, the Court will AWARD reasonable attorneys' fees and costs to Walburn in an amount to be determined upon a reasonableness review.

**I.    BACKGROUND**

Before the Court are matters arising from two motions to enforce settlement agreements reached by the moving parties and John Rodgers Burnley ("Burnley") following a settlement conference on November 17, 2023. The Court sets forth the relevant procedural history below to provide context for its resolution of the pending motions.

---

[1] The Court notes that a previous Motion to Enforce Settlement Agreement (ECF No. 162) and Memorandum in Support of Motion to Enforce (ECF No. 163) identified the movants as Walburn and Alexandra Valentin. (ECF Nos. 162, 163.) That Motion, as explained in this Opinion, was withdrawn. (ECF No. 166.) The present Motion to Enforce (ECF No. 167) is filed by Walburn only.

**A. Civil Action No. 3:23cv160.**

On March 7, 2023, Burnley initiated Civil Action No. 3:23cv160 against multiple defendants, including Alexandra Valentin ("Valentin"), Walburn, Robert Bono, Brittany Bono, Andrew Nash, Jordan Niermeyer, Mary Niermeyer, Cunningham, and Captain Donald Davenport ("Davenport"), asserting claims arising from alleged harassment, intimidation, and conspiratorial conduct by his neighbors and members of the Richmond Police Department. (ECF No. 1.) After litigation and motion practice, the parties participated in a court-ordered settlement conference before the undersigned on November 17, 2023. (ECF Nos. 106, 129.) Burnley proceeded *pro se* throughout the litigation, though he was represented by pro bono counsel for purposes of the settlement conference on November 17, 2023. (ECF No. 127.) During the settlement conference, the parties reached a settlement, which was memorialized in two written Settlement and Mutual Release Agreements: one was between Burnley and Walburn (ECF No. 168-1) (the "Walburn-Burnley Settlement Agreement"), and the other was between Burnley and Cunningham. (ECF No. 171-1) (the "Cunningham-Burnley Settlement Agreement") (collectively, the "Settlement Agreements"). On November 21, 2023, the parties filed a stipulation of dismissal pursuant to their respective settlement agreements. (ECF No. 160.) The Court entered a final order dismissing the case while expressly retaining jurisdiction "for the sole purpose of enforcing the settlement agreement, if necessary." (ECF No. 161.)

**B. The Walburn-Burnley Settlement Agreement.**

The Walburn-Burnley Settlement Agreement contains several provisions central to the present dispute. First, the parties included a release provision, wherein Burnley released all claims against Walburn that "arise out of or relate to the matters and claims asserted or which could have been asserted" in this action. (Walburn-Burnley Settlement Agreement ¶ 1(a).) Likewise, Walburn released potential defamation claims arising from Burnley's prior communications with Walburn's former employer, FedEx. (*Id.* ¶ 1(b); *see also* ECF No. 168 at 2.) Walburn agreed not to call the Richmond

Police Department about Burnley unless he had a "reasonable basis to believe that a crime or civil infraction" has or is being committed, or "in order to prevent imminent physical injury or death." (Walburn-Burnley Settlement Agreement ¶ 2.) For his part, Burnley agreed not to contact any past, present, or future employer of Walburn about Walburn. (*Id.* ¶ 3.) The settlement agreement also included a provision requiring written notice and an opportunity to cure as a condition precedent to any enforcement action. (*Id.* ¶ 4.) Specifically:

> As a condition precedent to the initiation any of [sic] action for enforcement, any lawsuit, or other legal proceeding alleging a breach of this Agreement, a Party shall send written notice by US Mail to all involved Parties describing the alleged breach and supplying written, audio, video, photographic, or other tangible evidence of the alleged breach. For purposes of this provision, an affidavit, declaration, written statement, or similar document by a Party or a Party's immediate family member, shall not constitute tangible evidence. The Parties agree that if a Party initiates an action for enforcement, lawsuit, or other legal proceeding without fully satisfying this condition precedent, then the action for enforcement, lawsuit, or legal proceeding shall be dismissed.

(*Id.* ¶ 5.)

Further, the parties agreed that the undersigned retained jurisdiction to enforce the settlement, and that the prevailing party in an enforcement action would be entitled to attorneys' fees and costs. (Walburn-Burnley Settlement Agreement ¶¶ 8–9.)

**C. The Cunningham-Burnley Settlement Agreement.**

Like the Walburn-Burnley Settlement Agreement, the Cunningham-Burnley Settlement Agreement contains mutual release provisions (Cunningham-Burnley Settlement Agreement ¶¶ 1(a)-(c).) It also has an identical "Notice of Breach" provision, requiring that a party initiating any "action for enforcement, any lawsuit, or other legal proceeding alleging a breach of this Agreement" shall first send written notice to "all involved Parties describing the alleged breach and supplying written, audio, video, photographic, or other tangible evidence of the alleged breach." (*Id.* ¶ 4.) The Notice of Breach provision explicitly provides that failure to do so will result in the "action for enforcement, lawsuit, or legal proceeding" being dismissed. (*Id.*) Like the Walburn-Burnley Settlement Agreement,

the Cunningham-Burnley Settlement Agreement has a fee-shifting provision providing that the prevailing party, in an enforcement action, "shall be entitled to recover their reasonable attorney's fees, expenses, disbursements, and costs of suit, including appellate fees and costs, from the non-prevailing Party or Parties." (*Id.* ¶ 8.) In addition to these provisions, the Cunningham-Burnley Settlement Agreement contains a "Non-Disparagement Provision" whereby the parties agreed that they will "not knowingly or intentionally disparage the other Parties concerning this Litigation or this Agreement." (*Id.* ¶ 3.)

### D. Burnley's Post Settlement Conduct.

In June 2024, Burnley allegedly contacted Walburn's employer, an apparent violation of paragraph 3 of the Walburn-Burnley Settlement Agreement. (ECF No. 168 at 2-3.) On August 27, 2024, Valentin and Walburn filed a Motion to Enforce the Settlement Agreement and a supporting memorandum. (ECF Nos. 162, 163.) The Court subsequently entered a briefing order on October 1, 2024, directing the moving parties to certify compliance with the settlement agreement's notice-of-breach provisions. (ECF No. 164.) Shortly thereafter, on October 7, 2024, Valentin and Walburn moved to withdraw their Motion to Enforce, which the Court granted on October 8, 2024. (ECF Nos. 165, 166.)

On November 19, 2024, Walburn provided Burnley with a written notice of breach. (ECF No. 168-3.) Specifically, counsel for Walburn sent, by USPS Priority Mail, a letter to Burnley identifying the provision of the Settlement Agreement he allegedly breached, providing a copy of the Settlement Agreement, and enclosing the audio recording of Burnley allegedly calling Walburn's employer. (ECF No. 168-3.)

On March 18, 2025, Burnley initiated a second lawsuit, Civil Action No. 3:25cv210[2], against

---

[2] *Burnley v. Walburn, et al.,* Civil Action No. 3:25cv210 (DJN) (E.D.Va. 2025). In the 3:25cv210 case, the Defendants Walburn, Valentin, and Cunningham moved to dismiss the complaint while

Walburn, Valentin, Cunningham, Davenport, and unnamed undercover police officers. *Burnley v. Walburn, et al.*, Civil Action No. 3:25cv210-DJN (E.D.Va. 2025.) Plaintiff alleged that his neighbors, acting in concert with Cunningham, Davenport, the Richmond Police Department, and unnamed federal agents, engaged in an ongoing conspiracy to harass, intimidate, and surveil him in retaliation for his prior lawsuit in Civil Action No. 3:23cv160 (RCY). (Civ. Action No. 3:25cv210, ECF No. 1.) Specifically, Burnley alleged, *inter alia*, that the named defendants assigned undercover officers to follow him, placed "ping" devices on his vehicles and phone, coordinated with federal agencies to "take him down," and conspired with neighbors to fabricate complaints against him. (*Id.*) Burnley expressly asked the Court to "reinstate" claims previously asserted in the settled 2023 action. (*Id.*)

### E. Current Procedural Posture.

On April 16, 2025, Walburn filed the instant Motion to Enforce the Settlement Agreement in the present case. *Burnley v. Walburn, et al.* Civ. Action No. 3:23cv160, (ECF No. 167.) On May 20, 2025, Cunningham filed a separate Motion to Enforce the Settlement Agreement and supporting memorandum. (ECF Nos. 170, 171.) They collectively argue that Burnley materially breached the settlement agreement by: (1) making defamatory statements to Walburn's employer (ECF No. 168 at 2); (2) disparaging parties to the litigation (ECF No. 171 at 2-3); (3) initiating new litigation barred by the settlement agreement (ECF No. 171 at 1-2); and (4) failing to comply with the settlement agreement's notice provisions. (ECF No. 171 at 3).

---

separately moving to enforce the settlement agreement and judgment entered in Civil Action No. 3:23cv160. *Id.* They further requested dismissal, or alternatively, transfer of the matter to the undersigned judge who presided over the settlement in the earlier action. *Id.* On February 4, 2026, the presiding judge dismissed the action without prejudice after noting that Burnley's claims in that matter "duplicate and reference the claims involved in [Civil Action 3:23cv160]" and finding that that case constituted "a more appropriate forum in which Burnley may seek the relief he requests in this matter." *Burnley v. Walburn, et al.,* Civ. Action No. 3:25cv210, ECF No. 30. Burnley has appealed the District Court's ruling dismissing his action. (*Id.* at ECF No. 31.)

Because Burnley had not filed a response to either motion, the Court entered an Order and Notice directing Burnley to respond by June 10, 2025, and to certify compliance with the settlement agreement's notice requirements. (ECF No. 172.) On May 27, 2025, Burnley filed responses to the Motions to Enforce. (ECF Nos. 173, 174, 175, 176.) On the same day, Burnley filed appeals in both the present matter and Civil Action No. 3:25cv210, all of which were dismissed by the Fourth Circuit. (ECF No. 177.)

## II.   JURISDICTION

As discussed above, the parties' settlement agreements provide that the Court retains jurisdiction to enforce the settlement agreement. (Walburn-Burnley Settlement Agreement ¶ 8; Cunningham-Burnley Settlement Agreement ¶ 7.) This language was expressly included in the District Court's dismissal order on November 22, 2023, which stated that the Court shall "retain jurisdiction for the sole purpose of enforcing the terms of the settlement agreement, if necessary." (ECF No. 161.) Accordingly, the Court has jurisdiction to resolve the Motions to Enforce.

## III.   STANDARD OF REVIEW

District courts possess "inherent authority, deriving from their equity power, to enforce settlement agreements." *Hensley v. Alcon Labs., Inc.*, 277 F.3d 535, 540 (4th Cir. 2002) (citing *Millner v. Norfolk & W. Ry. Co.*, 643 F.2d 1005, 1009 (4th Cir. 1981)). A settlement agreement is a contract, and therefore standard contract principles apply when considering a motion to enforce a settlement agreement. *See Bradley v. Am. Household Inc.*, 378 F.3d 373, 380 (4th Cir. 2004). To enforce a settlement agreement, the court must (1) find that the parties agreed to settle the case, and (2) be able to determine terms of the settlement. *See Moore v. Beaufort Cty., N.C.*, 936 F.2d 159, 162 (4th Cir. 1991). "In deciding whether a settlement agreement has been reached, the Court looks to the objectively manifested intentions of the parties." *Id.* (citing *Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076, 1083 (4th Cir.1987)). The clearest manifestation of intent is the contract's plain language.

*See Providence Square Assoc., L.L.C. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000). If a court determines that the parties entered into a binding settlement agreement, it may enforce the agreement without the need for a hearing. *See Cosby v. Huntington Ingalls, Inc.*, No. 4:17cv112, 2018 WL 1511735, at *2 (E.D. Va. Mar. 27, 2018) (citing *Hensley*, 277 F.3d at 540).

Here, the parties have reached a complete agreement to resolve Burnley's claims. The Settlement Agreements were the culmination of a settlement conference and were signed by all of the parties, including Burnley with the guidance, assistance and advice of his pro bono settlement counsel. (ECF Nos. 168-1, 171-1.) It plainly contains a complete agreement, with all material terms sufficiently definite for the Court to determine each term's meaning, and it sets forth the parties' respective rights and obligations. Thus, the Court finds that the Walburn-Burnley Settlement Agreement and the Cunningham-Burnley Settlement Agreement are valid and enforceable contracts between the parties. The question remains as to whether Burnley breached these settlement agreements. For the reasons stated below, the Court finds that Burnley violated the Walburn-Burnley Settlement Agreement by contacting Walburn's employer about Walburn. However, the Court finds that Cunningham's Motion to Enforce asks for relief already granted by the District Court in Civil Action No. 3:25cv210; as a result, the Court DENIES her Motion to Enforce, in part, as MOOT. To the extent that Cunningham seeks to enforce the non-disparagement provision in the Cunningham-Burnley Settlement Agreement, the Court DENIES the Motion to Enforce WITHOUT PREJUDICE, for the reasons stated below.

## IV.    DISCUSSION

### A.    Burnley violated the Walburn-Burnley Settlement Agreement by Contacting Walburn's Employer regarding Walburn.

Beginning in June 2024, a caller identifying himself as "Tyrone Jackson" contacted Walburn's

new employer (Livewire), by telephone.[3] (ECF No. 168 at 2-3.) The caller identified Walburn's home address, his previous employer, FedEx, and stated that Walburn, among other things: (1) was "stealing materials from [Livewire];" (2) has a "terrible drug habit;" (3) sells drugs; and (4) previously lost employment for those reasons. (ECF No. 168 at 2-3.) Walburn's Supporting Memorandum surmises that the caller was Burnley using a pseudonym, as: (1) Walburn recognized the caller's as Burnley's voice; (2) Walburn is not acquainted with anyone named Tyrone Jackson; (3) Tyrone Jackson is the name of one of Burnley's former neighbors; (4) the substance of the call matches prior remarks Burnley previously directed to Walburn's previous employer, FedEx; and (5) the caller had "knowledge uniquely available to [Burnley], including information about Walburn's past and present employment, Walburn's home address, where Walburn parks his work truck, and Walburn's whereabouts." (ECF No. 168 at 3 n.3; *see also* ECF No. 117-1.) As a result of these calls, Livewire initiated an internal inquiry. (ECF No. 168 at 3.)

Walburn maintains that Burnley, using the pseudonym "Tyrone Jackson," materially breached the Walburn-Burnley Settlement Agreement's express prohibition against contacting Walburn's employers about Walburn. (ECF No. 168-1 ¶ 3.) In defense, Burnley denies calling Walburn's current employer and claims that the Court cannot assume it was him based on voice comparison alone. (Pl.'s Resp. to Walburn's Motion to Enforce, ECF No. 176 at 3-4.) He adds that any connection to a former neighbor named "Tyrone Jackson" is incorrect, as the man who once lived across from Burnley was named "Tyrone Miller." (*Id.* at 3-4.) He argues that the Court cannot grant the Motion to Enforce because the audio recordings have not been "authenticated prior to admission" pursuant to Federal Rule of Evidence 901(a). (*Id.*) Instead, he argues, the recordings are either someone else entirely or are a manipulated audio made by artificial intelligence to "clone" his voice. (*Id.*) Given Burnley's

---

[3] In his memorandum in support, Walburn submitted an audio recording of the phone call to Livewire as Exhibit B, which the Court will refer to only as represented in Walburn's sworn filings. (ECF No. 168-2.)

dispute over the authenticity of the audio recording, the Court ordered supplemental briefing and conducted an evidentiary hearing on the issue. (ECF No 184.)

### 1. The Court's Findings Regarding the Authenticity of the Audio Recording.

On February 18, 2026, Walburn filed a supplemental brief containing a sworn declaration from Dustin Roskam ("Roskam"), a manager at Livewire who received the audio recording[4] from a service agent at Parasol, LiveWire's affiliate. (ECF No. 186-2 ("Roskam Decl.").) After receiving and reviewing the recording, Roskam "shared a copy of it with Mr. Walburn." (Roskam Decl. ¶ 8.) Roskam certified that "the recording in the Court's possession and the written communication between [him] and Parasol's service agent . . . are original or exact duplicates of the original evidence." (*Id.* ¶ 9.)

In addition to Roskam's Declaration, Walburn submitted a sworn declaration. (ECF No. 186-1 ("Walburn Decl.").) In it, Walburn declared that he has been "acquainted with [Burnley] for approximately 5 years[,]" and has "had the opportunity to engage in conversations with him and hear his voice on multiple occasions." (Walburn Decl. ¶ 2.) He declared that he received a copy of the audio recording from Raskom on June 10, 2024, and that it is his "sworn opinion and belief that the audio recording is both authentic and that 'Tyrone Jackson's' identity is [Burnley]." (*Id.* ¶¶ 6-7.) He based his sworn opinion and belief on recognizing Burnley's voice "from numerous prior verbal interactions with him." (*Id.* ¶ 7.) Finally, Walburn certified that "the recording in the Court's possession is original or an exact duplicate of the original recorded evidence." (*Id.* ¶ 8.)

On February 23, 2026, Burnley responded to Walburn's supplemental brief. (ECF No. 187.) In his response, Burnley maintains that: (1) the declarations of Walburn and Roskam are defective because referenced exhibits were not attached (*Id.* ¶¶ 1-3); (2) that the declarations themselves must

---

[4] According to Roskam, ""[a]ll calls coming in to LiveWire, through Parasol, are recorded[,]" and that it is "the regular practice of Parasol service agents to record incoming calls and share them as necessary with LiveWire management." (Roskam Decl. ¶¶ 4, 6.)

be stricken as submitted in bad faith pursuant to Civil Procedure Rule 56(h) (*Id*. ¶ 4); (3) there are deficiencies in the chain of custody that require a certificate of authentication (*Id.* ¶ 8-9); and (4) it would "be an abuse of judicial process to attempt to authenticate [the audio recording] on February 17, 2026 when the telephonic recording occurred on June 6, 2024 (*Id.* ¶11, citing *United States v. Howard-Arias*, 679 F.2d 363 (4th Cir. 1982)). Further, Burnley denies having any conversations with Walburn which would substantiate Walburn's claim that he can recognize Burnley's voice. (ECF No. 187 ¶ 10.)

Federal Rule of Evidence 901(a) requires only that the proponent of evidence produce evidence "sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "Importantly, the burden to authenticate under Rule 901 is not high—only a prima facie showing is required . . . ." *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014). The Court finds that Walburn sufficiently established the authenticity of the audio recording through the sworn declarations of Walburn and Roskam.[5] The declarations primarily established: (1) how the recording was made; (2) how the recording was received; and (3) that the recording in the Court's possession is an original or exact duplicate. The Court finds that none of these foundational facts depend on the attachment of an exhibit, as Burnley contends. Indeed, the absence of an exhibit, however referenced in the declaration, does not render sworn, factual statements inadmissible, nor does it undermine authentication under Rule 901. At any rate, the Walburn cured this deficiency by filing their Reply to Burnley's Response and attaching the exhibits referenced in the Walburn and Roskam declarations.[6]

---

[5] Burnley incorrectly notes that both Walburn and Roskam filed "unsworn" declarations. (ECF No 187 ¶¶ 1-2.) The Court finds that the declarations are sworn declarations pursuant to 28 U.S.C. § 1746, as both declarants declared "under penalty of perjury that the foregoing statements are true and correct . . . ." (ECF Nos. 186-1 at 3, 186-2 at 3.)

[6] In his Reply, Walburn represented that the exhibits "were inadvertently not attached to the Defendants' Brief" but that "both exhibits have already been in the Court's and [Burnley]'s possession for over a year, as they were attached or embedded" within the initial, but later withdrawn, Memorandum in Support of Motion to Enforce Settlement Agreement (ECF No. 163, . 188 at 1.)

(ECF No. 188.)

Similarly, the Court finds Burnley's reliance on the "sham affidavit" doctrine and Federal Rule of Civil Procedure 56(h) to be unavailing for multiple reasons. First, the sham affidavit doctrine applies where a party submits an affidavit that directly contradicts prior sworn testimony without explanation. *See Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Cir. 1984). Burnley identifies no prior testimony by Walburn or Roskam that is contradicted by their declarations. Second, Rule 56(h) applies only in the context of summary judgment affidavits submitted in bad faith. This proceeding concerns enforcement of a settlement agreement, not summary judgment, and Burnley cites no authority extending the sham affidavit doctrine to unsworn factual disagreements in settlement agreement enforcement proceedings.

Burnley next devotes substantial attention to alleged deficiencies in the audio recording's chain of custody, asserting that federal law requires complete documentation of every individual who accessed the recording, including dates, times, and storage locations, and that failure to do so violates due process. This argument misstates the law. The Fourth Circuit has made clear that "[e]stablishing a strict chain of custody is not an iron-clad requirement, and the fact of a missing link does not prevent the admission of real evidence, so long as there is sufficient proof that the evidence is what it purports to be and has not been altered in any material respect." *United States v. Summers*, 666 F.3d 192, 201 (4th Cir. 2011). Burnley argues that Roskam's declaration "failed the three (3) main requirements to satisfy the (chain of custody); (1) control (2) continuity and (3) documentation." (ECF No. 187 at 3) (punctuation in original.) To the contrary, the Court was presented with uncontroverted declarations explaining how the call was recorded in the ordinary course of business, transmitted internally, and provided to Walburn. (Roskam Decl. ¶¶ 7-8; Walburn Decl. ¶ 6.) Both declarants certified that the recording in the Court's possession "is original or an exact duplicate of the original recorded evidence." (Roskam Decl. ¶ 9; Walburn Decl. ¶ 8.)

11

Nonetheless, Burnley maintains that Roskam failed to explain "where the voice recording of June 6, 2024 was stored and the names of the LiveWire employees that had access to the recording" as well as file a "certificate of authentication." (ECF No. 187 at 3.) Though Rule 901 governs authentication, it does not require certificates, seals, or formal attestations beyond evidence "sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Rule 901(b) provides "examples only—not a complete list—of evidence that satisfies the requirement" to authenticate evidence. Fed. R. Evid. 901(b). Burnley's insistence on additional formalities finds no support in the Federal Rules or Fourth Circuit law. On the other hand, Rule 901(b) non-exhaustive list of evidence that satisfies Rule 901(a)'s authenticity requirement expressly states that "[t]estimony of a witness with knowledge" that "an item is what it is claimed to be" is sufficient. Fed. R. Evid. 901(b)(1). Here, the Court has been presented with two declarations, sworn under penalty of perjury, testifying that the audio recording is what it purports to be, which plainly satisfies Rule 901.

Moreover, the Fourth Circuit in *Howard-Arias* has held that "ultimate question is whether the authentication testimony was sufficiently complete so as to convince the court that it is improbable that the original item had been exchanged with another or otherwise tampered with." 679 F.2d at 366. Here, the Court is satisfied that the sworn statements from both declarants establish that the audio recording has not been changed or altered in any material way, and that the exhibit before the Court is an "original or an exact duplicate of the original recorded evidence." (Walburn Decl. ¶ 8; *see also* Roskam Decl. ¶ 9.)

Curiously, Burnley claims that the Fourth Circuit in *Howard-Arias* bars the Court from "attempt[ing] to authenticate [the audio recording] on February 17, 2026 when the telephonic recording occurred on June 6, 2024." (ECF No. 187 at 4.) Doing so, according to Burnley, would be "unfair and unjust" and would "allow Walburn and Valentin to get a second bite of the apple." (*Id.*)

The case stands for no such proposition. In *Howard-Arias*, the Fourth Circuit confirmed that evidence must be authenticated before it is admitted into evidence, consistent with Rule 901. *See* 679 F.2d at 366. Here, the Court must determine whether the Walburn produced "evidence sufficient to support a finding" that the audio recording is what the Walburn claims it is. Fed. R. Evid. 901(a). Based on the evidence presented, which included two sworn declarations, the Court is satisfied that the audio recording is authentic and has not been materially altered.

*2. The Court's Findings Regarding the Identity of the Caller.*

The Court now turns to whether the Walburn sufficiently established that the voice of the caller identifying himself as "Tyrone Jackson" on the audio recording was actually Burnley. Walburn's declaration appears to satisfy Rule 901(b)(5), which regards evidence sufficient for authentication purposes in the form of "[a]n opinion identifying a person's voice –whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker." Fed. R. Evid. 901(b)(5). Here, Walburn attests, under penalty of perjury, that he has known Burnley for approximately five years, has heard his voice on numerous occasions, and recognizes the voice on the recording as Burnley's voice.

Burnley, however, denies that he called LiveWire on June 6, 2024, and is skeptical that Walburn would be able to recognize his voice. (ECF No. 187 at 2, 4.) He argues that he has "under no circumstances had numerous conversations with [Walburn]," but admits that Walburn spoke to Burnley in the past. (ECF No. 187 at 4.) In support, he claims that the allegedly racist remarks giving rise to the underlying complaint began shortly after Walburn moved next door to him, which is why he "never had any reason to conversate with Walburn and Valentin." (*Id.*)

Given the issues raised by Burnley as to the authenticity and identity of the caller on the audio recording, the Court convened an evidentiary hearing on March 4, 2026. During the hearing, the Court

13

heard the audio recording live. (ECF No. 194 ("Hearing Transcript") at 13:5.) Walburn testified that the recording was an accurate, unaltered copy of the recording he heard when his supervisor, Mr. Roskam, shared it with him. (Hearing Transcript. 13: 8-14.) Walburn clarified that he had previously worked for FedEx, was not fired for selling illegal narcotics, and does not know of anyone, including those who live on his street, named Tyrone Jackson. (Hearing Transcript. 13:22-4.) He testified that he recognized the voice on the audio recording as Burnley's voice because "it sounds exactly like him," and that "[g]iven the previous lawsuits, his previous interactions calling FedEx, and all of the novel information in there, [there] is only one person, which is him." (Hearing Transcript. 14:9-19.) Walburn noted that he could recognize Burnley's voice because Walburn had "two or three conversations with him" about "four or five years ago" and has heard him "sometimes outside or so." (Hearing Transcript. 11:10-14.)

On cross-examination, Burnley questioned Walburn about how Walburn recognized the caller as Burnley, to which Walburn responded: "I have ears" and "I can hear." (Hearing Transcript 17:23-25, 18:1-2.) The Court provided Burnley the opportunity to testify, under oath, that the voice on the recording was not his. (Hearing Transcript 6:11-25.) Notably, Burnley declined to testify under oath that it was not his voice on the recording. (Hearing Transcript 7:1-4.)

Based on the evidence presented, the Court credits the statements by "Tyrone Jackson" on the audio recording as having been made by Burnley. First, despite being given the opportunity to testify in open court, under penalty of perjury, Burnley declined to state on the record that he did not call LiveWire on June 6, 2024 and that the statements captured on the audio recording were made by him. Second, Walburn sufficiently identified Burnley's voice as the voice of "Tyrone Jackson" based on hearing Burnley's voice on prior occasions as his neighbor. Third, Walburn notes that Burnley previously swore, in an affidavit, that Burnley had contacted Walburn's former employer, FedEx, in 2023 and alleged that Walburn used illegal drugs and tried to sell Burnley illegal drugs "on numerous

14

occasions." (ECF No. 168 at 2 n.1 (citing ECF No. 117-1 at 6).) The Court considers this previous behavior as relevant to proving Burnley's identity as the caller who lodged nearly identical accusations against Walburn in the phone call to Walburn's current employer, LiveWire. *See* Fed. R. Evid. 404(b)(2) (permitting the use of prior acts for the admissible purpose of proving identity and not for proving propensity in conformance with the prior acts). Here, the Court finds that Burnley's use of a pseudonym demonstrates awareness of the contractual prohibition and an attempt to evade it. Such conduct indicates that Burnley not only circumvented the settlement agreement in bad faith, but willfully breached it. His unwillingness to testify under oath to the contrary further shows that Burnley is aware of the consequences of his actions but nonetheless refuses to take accountability for them. Given the seriousness of Burnley's behavior in flagrantly violating the settlement agreement, the Court finds that enforcement is necessary.

**B. Cunningham's Motion to Enforce is Denied in Part as Moot and Denied in Part Without Prejudice.**

Cunningham maintains that Burnley's subsequent lawsuit, Civil Action No. 3:25cv210, seeks to relitigate settled claims, further undermining and violating the Cunningham-Burnley Settlement Agreement. (ECF No. 171 at 3.) According to Cunningham, Burnley's allegations in the subsequent lawsuit "fall within the terms of the Settlement Agreement[,]" as the Complaint "contains purported breaches of the Settlement Agreement . . . ." (*Id.* at 2.) For example, Cunningham points to Burnley's allegations that Cunningham assigned undercover police officers and intended to "make his life and his family life a 'living hell'" in retaliation "for filing that lawsuit against her (3:23CV160(RCY))." (*Id.* at 3, citing Def. Cunningham Ex. B (ECF No. 171-2).) Given this, "[Burnley] has filed his New Complaint without complying with the conditions of the Settlement Agreement – he did not provide Cunningham with notice of the alleged breach or evidence in support thereof." (ECF No. 171 at 3.)

In response, Burnley maintains that the claims filed in Civil Action 3:25cv210 "have absolutely nothing to do with the [sic] Settlement Agreement that occurred on November 17, 2023.

15

The claims may be similar in nature but its [sic] (after the fact)." (ECF No. 174 at 1) (parentheses in original.) He argues that: (1) Cunningham is using the Settlement Agreement as a "'procedural bar' to deny [Burnley]'s due process rights[;]" (2) the "Settlement Agreement is not binding because it was drawn up by Cunningham's attorneys' [sic] for her benefit[;]" (3) Cunningham improperly brought "the Motion to Enforce Settlement Agreement without first giving [him] 'written notice of the breach by certified mail;'" and (4) the District Judge in Civil Action No. 3:25cv210 found that the subsequent litigation alleged conduct which occurred after the parties' settlement in this case. (*Id.* at 1-2.)

Like the Walburn-Burnley Settlement Agreement, the Cunningham-Burnley Settlement Agreement contains an identical "Notice of Breach" provision, requiring that a party initiating any "action for enforcement, any lawsuit, or other legal proceeding alleging a breach of this Agreement" shall first send written notice to "all involved Parties describing the alleged breach and supplying written, audio, video, photographic, or other tangible evidence of the alleged breach." (Cunningham-Burnley Settlement Agreement ¶ 4.) The Notice of Breach provision explicitly provides that failure to do so will result in the "action for enforcement, lawsuit, or legal proceeding" being dismissed. (*Id.*)

In her enforcement action, Cunningham asks the Court to dismiss the subsequent lawsuit, Civil Action No. 3:25cv210, on the basis that Burnley did not provide her with notice as required by the Settlement Agreement. After she filed her Motion to Enforce, the District Court subsequently dismissed Civil Action No. 3:25cv210, rendering Cunningham's request for relief moot. *Burnley v. Walburn, et al.,* Civ. Action No. 3:25cv210, ECF No. 30. To the extent that Cunningham seeks fees, costs, and other "relief as appropriate," the Court is similarly constrained by the four corners of the settlement agreement, including its notice provision. Here, the plain language of the settlement agreement required Cunningham to provide written notice that Burnley allegedly breached the settlement, and to include with that notice "written, audio, video, photographic, or other tangible

16

evidence of the alleged breach." (Cunningham-Burnley Settlement Agreement ¶ 4.). Unlike Walburn, there is no record that Cunningham sent written notice containing the requisite evidence showing breach to Burnley prior to initiating the enforcement action in this case. (ECF No. 168 at 4 n.4.) Therefore, the Court DENIES Cunningham's Motion to Enforce (ECF No. 170) without prejudice. Because the Court is denying Cunningham's Motion to Enforce without prejudice, the Court need not address the remainder of Burnley's arguments on the merits of Cunningham's enforcement action at this time.

## V.    ATTORNEY'S FEES

As a general rule, each litigant bears the expense of his or her own attorneys' fees absent a contrary rule of court or express statutory or contractual authority for recovery. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 631 (4th Cir. 1999).  Here, the Walburn-Burnley Settlement Agreement provides that:

> in the event that any litigation is commenced in connection with the construction, interpretation, or enforcement of this Agreement or to enforce any obligation imposed by or contained in this Agreement, the prevailing Party or Parties shall be entitled to recover their reasonable attorney's fees, expenses, disbursements, and costs of suit, including appellate fees and costs, from the non-prevailing Party or Parties.

(Walburn-Burnley Settlement Agreement ¶ 9.) Thus, by its plain language, the parties expressly agreed that the prevailing party in an enforcement action shall be awarded its costs and attorney's fees. (*See id.*) The Court finds that the parties' fee-shifting provision of the agreement requires an award of costs and reasonable attorneys' fees to Walburn, which will be subject to a reasonableness review. Therefore, Walburn is DIRECTED to file a formal fee petition outlining the total fees and costs requested with the appropriate supporting documentation. Such filing must occur **not later than April 9, 2026**. Burnley's response, if any, shall be filed **not later than April 23, 2026**. Any Reply, if necessary, shall be filed by **April 30, 2026**.

## VI.   CONCLUSION

For the reasons stated above, the Court hereby GRANTS Walburn's Motion to Enforce (ECF No. 167); DENIES, in part as moot, and DENIES, in part, without prejudice Cunningham's Motion to Enforce (ECF No. 170); and AWARDS Walburn reasonable attorneys' fees and costs against Burnley in an amount subject to a reasonableness review.

Let the Clerk file this Memorandum Opinion electronically, notify all counsel of record and *pro se* litigant Burnley, and send a copy to United States District Judge Roderick C. Young.


/s/   MRC

Mark R. Colombell
United States Magistrate Judge


Richmond, Virginia
Date: March 18, 2026